Filed 1/7/25  P. v. Ruvalcaba CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Glenn)

----

| | |
|---|---|
| THE PEOPLE, | C095929 |
| Plaintiff and Respondent, | (Super. Ct. No. 16NCR10593) |
| v. | |
| ALFREDO RODRIGUEZ RUVALCABA, | |
| Defendant and Appellant. | |

Defendant Alfredo Rodriguez Ruvalcaba appeals from his conviction of first degree murder, arguing that his hospital bed confession was made without a proper waiver of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and should not have been admitted as evidence against him.  We disagree and affirm.

**LEGAL AND FACTUAL BACKGROUND**

On July 4, 2015, at approximately 1:20 p.m., officers arrived at Ruvalcaba's orchard property to investigate a possible homicide or suicide.  In a small office in the

shop building, a young woman, wearing only a bra and underwear, was seated on a chair, with a gunshot wound to her face. The young woman was later identified as Melissa, with whom Ruvalcaba was having sex. At the time of Melissa's death in 2015, Ruvalcaba was 53 years old, and Melissa was 16 years old.

An expended shotgun shell casing was on the floor, under a desk. Footprints were located at the northwest corner of the shop. No firearm was present, which made the officers question whether her death was a suicide.[1] Ruvalcaba's truck was next to the shop.

The following day, July 5, at approximately 10:30 p.m., Detective Greg Felton found Ruvalcaba lying, unresponsive, by the side of a road less than a mile from his orchard. He was wearing socks and underwear, was very dirty, and had cuts on his lips and bruises on his face. Detective Felton administered aid until an ambulance arrived and transported Ruvalcaba to the hospital.

During a search of Ruvalcaba's orchard the same evening (July 5), officers found an empty tequila bottle, packaging for 40 Lexotan[2] pills, a 12-gauge shotgun, an empty beer container, a flashlight, a cell phone, a pair of shoes, and an empty water bottle. The shotgun was jammed and had a red Winchester 12-gauge shell in the chamber.

## A. Melissa

For several years prior to Melissa's death, Melissa's father was in business with Ruvalcaba buying and selling walnuts. Melissa and Ruvalcaba met during that time. In 2013, Ruvalcaba was charged with continuous sexual abuse of Melissa, in violation of

---

[1]     At trial, evidence supporting the theories of suicide or homicide was admitted and argued. In light of the arguments raised on appeal, we need not discuss in depth the evidentiary support for these competing theories.

[2]     Also referred to as "Lexopam" in the transcript.

Penal Code section 288.5.[3] Melissa's father was aware of their friendship but did not know that it was sexual. After Melissa's father learned that Ruvalcaba had been charged with sexual misconduct with Melissa, he continued to socialize and conduct business with Ruvalcaba. In 2014, Ruvalcaba even joined Melissa's family for her Quinceanera, and helped pay for it.

On July 3, 2015, Melissa and her family went to a party at a friend's home. Ruvalcaba was there. When Melissa and her family members returned home, they each went to their separate rooms. Melissa's father did not hear anything out of the ordinary that night. The next morning, he saw a ladder at Melissa's open window; she was gone. Her phone was on her bed and showed a phone call from Ruvalcaba. Melissa's father called Ruvalcaba with no response, and then went to Ruvalcaba's shop. There, he saw Ruvalcaba's truck, went into the shop, and found Melissa's body.

Vaginal swabs from Melissa contained sperm, the DNA from which matched Ruvalcaba's profile.

A search of Melissa's bedroom showed nothing broken or out of place and no signs of a struggle. Two photographs of her with Ruvalcaba were in the bedroom on the dresser. Her cell phone, purse, and wallet were on her bed.

Melissa's phone contained screenshots of Ruvalcaba's wife and a list of addresses associated with her, including the address of the shop. There were also screenshots of address listings for Ruvalcaba. There was a screenshot with the name of Ruvalcaba's brother. The phone contained numerous text messages and phone calls between Melissa and Ruvalcaba.

---

[3] The records also showed that, after a failure to appear, an arrest warrant had been issued and was pending at the time of the murder. After Melissa's death, the sexual abuse case was dismissed.

Detective Felton's investigation revealed no indication of any disagreements between Melissa or her family and Ruvalcaba or that Melissa did not want Ruvalcaba to contact her. Nor was there any indication that Melissa wanted to kill herself.

## B.      Ruvalcaba

Ruvalcaba testified that in January 2013, he was arrested for continuous sexual abuse against Melissa. After he was released on bail, he continued to have contact with Melissa, in violation of the court's order. In February 2013, he absconded to Mexico. When he returned, Ruvalcaba continued to get together with Melissa's family. He admitted he was having sex with Melissa but claimed they waited until she was 16 years old.

They planned to get married. They talked about where they would live when they were married, and she showed him pictures of his family's homes. Ruvalcaba told her that his brother owned half those properties, and that he was going to leave his properties to his wife and children when he and Melissa got married. They would buy their own house and orchard.

## C.      Interview with Detective Felton

Two days after Ruvalcaba was admitted to the hospital, Detective Felton went to the hospital to attempt to speak with him. He found Ruvalcaba unable to communicate with him, so he left. Buddie Minnick, a private security guard, was posted to guard Ruvalcaba. On July 8, Minnick notified Detective Felton that Ruvalcaba was speaking. Detective Felton went to the hospital to interview Ruvalcaba.

A video of this interview was played for the jury. Two transcripts of the recording were submitted to the jury for guidance, one from each party, with the prosecution transcript as court exhibit No. 4 and the defense transcript as court exhibit No. 5.[4]

---

[4]      We granted Ruvalcaba's request to augment the record with both transcripts.

4

Detective Felton began by telling Ruvalcaba that "I'm the guy that saved you" when he found Ruvalcaba by the side of the road. Ruvalcaba did not remember, and after additional questions by the officer, Ruvalcaba said he wanted to die. Detective Felton then asked him three times why he wanted to die, and after a pause, Ruvalcaba said, "I shoot somebody."

Detective Felton then delivered warnings pursuant to *Miranda, supra*, 384 U.S. 436, and continued the interview, asking Ruvalcaba who he had shot. During the interview, Ruvalcaba stated that on the night of July 3, he picked up Melissa at her home, they went to his shop, and he shot Melissa, after which he tried to shoot himself and then consumed 40 pills, a bottle of tequila, and a beer.

Ruvalcaba explained that Melissa was going crazy; she was pushing him to do anything she wanted. She wanted his love, his money, and for his family to move out of his house. She told him that he was going away for the rest of his life.

### D. Trial Testimony

At trial, Ruvalcaba claimed Melissa killed herself.

Ruvalcaba testified that when he met Melissa at her home, she came to his truck in her underwear. When he asked her about her clothes, she responded that she was fine. At her request, he drove to his shop. They discussed buying a car she had test-driven with him and her family. Ruvalcaba agreed with the idea but said he did not have the money yet, and she seemed okay with that.

At the shop, they went into the office, where they had sex on a roll-away bed. They discussed the car she wanted.

When Ruvalcaba returned from going outside to urinate, he saw from the office doorway that Melissa was sitting on a chair by the bed, holding the shotgun. She was looking into the barrel and had her foot up in the area of the trigger, and then the shotgun fired.

5

Ruvalcaba was in shock. It was clear that she was dead. He picked up the shotgun and unsuccessfully tried to shoot himself, so he could die and be with her.

He then went outside to his truck where he had some pills a doctor in Mexico had prescribed to him for anxiety, Lexotan. Ruvalcaba took 40 pills with a bottle of water, beer, and a whole bottle of tequila. He took about 10 pills when he was still at the truck and continued to take them as he walked around in the orchard. He was also carrying the shotgun. He did not recall anything after that. He did not recall how he got to where he was found. He did not remember being in the hospital or the interview with Detective Felton.

### E.     Verdicts and Sentencing

A jury found Ruvalcaba guilty of murder (Pen. Code, § 187, subd. (a) — count I)[5] and found true a separate allegation of premeditation and deliberation (§ 1192.7, subd. (c)) and that Ruvalcaba personally and intentionally used a firearm to cause her death (§ 12022.53, subd. (d)).[6]

The court sentenced Ruvalcaba to a term of 25 years to life on the first degree murder conviction, plus a 10-year enhancement for personal use of a firearm under section 12022.53, subdivision (b).

He timely appeals.[7]

---

[5]     Undesignated statutory references are to the Penal Code.

[6]     After the jury was unable to reach a verdict on kidnapping (§ 207, subd. (a) — count II), the court declared a mistrial on that count.

[7]     The notice of appeal was filed on March 11, 2022. After multiple motions, record augmentations, and extensions of time to file their briefs, this case was fully briefed on August 30, 2024, and thereafter assigned to this panel.

## DISCUSSION

Ruvalcaba argues that when he was interviewed in the hospital, he was mentally incapacitated, still suffering from the physical effects from his overdose and initial comatose state. As a result, he claims, his waiver of his *Miranda* rights was not knowing, intelligent, or voluntary and his statement should have been excluded. We disagree.

### A.    Additional Background

Prior to trial, Ruvalcaba made several piecemeal attempts to suppress his statement to Detective Felton.[8]

#### 1.    *Evidence Code Section 402 Hearing*

Prior to the jury trial, the court held an evidentiary hearing pursuant to Evidence Code section 402. Security guard Minnick[9] testified that he was an armed guard assigned to guard Ruvalcaba while he was in custody at the hospital. Detective Felton instructed him to observe Ruvalcaba and to call Detective Felton when Ruvalcaba was able to speak.

On July 7 and 8, Minnick had conversations with Ruvalcaba in English about farming, and on July 8, he called Detective Felton to report that Ruvalcaba was coherent. Ruvalcaba was in a room by himself, with no visitors allowed.

Detective Felton testified that on July 8, he found Ruvalcaba "restrained" in his bed, connected to intravenous (IV) lines, with his hands wrapped in large mittens.

---

[8]    We grant the People's request to take judicial notice of the records in case No. C087018 in which Ruvalcaba sought writ review of the trial court's denial of his motion to exclude his statement. We may take judicial notice of our own records. (Evid. Code, § 452, subd. (d).)

[9]    At the time he testified at the hearing, Minnick was serving a prison sentence for a conviction under section 288. He had written a letter to the prosecutor, asking the prosecutor to help him with his case, because he was going to "help convict Mr. Ruvalcaba."

Detective Felton did not investigate whether any of Ruvalcaba's medical conditions or his probable ingestion of 40 Lexotan pills affected his memory or understanding of past or present events.

Detective Felton conducted a videotaped interview, which the court viewed during the hearing. No transcript was submitted at this time.

a. The recorded interview[10]

Detective Felton asked Ruvalcaba if he spoke English, to which Ruvalcaba replied, "so-so." Detective Felton then told Ruvalcaba, "I'm the guy that saved you on the side of the road." Ruvalcaba said he could not remember that. Detective Felton asked whether he wanted to be saved to which Ruvalcaba responded affirmatively. Detective Felton said, "Well, that's what I did. I found you. I was the guy that ah, was holding your neck so you could breathe." Ruvalcaba asked some questions about how and where he was found, then said that he wanted to die. The following exchange took place:

"Q. You want to die? Why?

"A. I feel like it.

"Q. Because of [what or why]?

"A. I feel like it.

"Q. Why do you feel like it?

"A. I . . . I shoot somebody."

---

[10]     On appeal, the parties cite to the transcripts of the interview prepared by each party at trial. These were not admitted as evidence. Because the parties did not agree on the reliability of a single version, both transcripts were provided for the jury for guidance purposes. The jury was instructed the transcripts were assistive only and not evidence. We rely on the recording itself and note when Ruvalcaba's statements are not objectively clear.

Detective Felton then read Ruvalcaba his *Miranda* rights in English.  Detective Felton obtained affirmative answers after re-asking whether Ruvalcaba understood some of his rights.  When Detective Felton asked if Ruvalcaba felt okay with talking to him, Ruvalcaba clearly answered, "Yes, I do."  Detective Felton then asked about the shooting: "Okay.  tell me what happened.  Who did you shoot?" and, after a pause, Ruvalcaba said he had shot "the girl."

Ruvalcaba continued to explain.  He said that she "was pushing me" to do "anything she want" and "to spend my money" and she wanted his family out of his house.  According to Ruvalcaba, "she was going crazy."  Ruvalcaba said that she told him she would turn him in, and he would go to jail for the rest of his life.

The officer asked about the kind of gun that was used, and Ruvalcaba said "a 30/30."  Detective Felton asked if he was sure, "cause you don't own a 30/30."

When Detective Felton asked if Melissa was 16, Ruvalcaba replied that she was 17.  The officer asked where he shot her, and Ruvalcaba confirmed it was in her face.  Ruvalcaba said that after he shot her, he tried to shoot himself with the 30/30, but he missed, and he left the gun in his truck, went into the orchard, and took 40 pills, a bottle of tequila, water, and a beer.  Ruvalcaba said:

"A. Well, . . . I didn't die.

"Q. You didn't die.  That's right, that's good.

"A. I didn't die?

"Q. No."

Ruvalcaba was asked where he put the gun and he initially said he left it "in another world," but then said he left it in his truck.  The officer asked how the victim got to the shop, and Ruvalcaba replied, "she wanted to go to the shop."  He confirmed she went out the window in her bra and underwear and that she forgot her phone.  Ruvalcaba said that they were at the shop for maybe 30 minutes and that she was sitting when he shot her.

Ruvalcaba said she asked him for a lot of things, including a car, which he could not afford. He said he shot Melissa because she wanted a new car like her sister. He repeated that after he shot Melissa, he tried to shoot himself in the mouth, and took off one of his shoes to do it but could not reach to shoot himself.

Detective Felton noticed Ruvalcaba was crying and asked if he was sorry for what he did to her. Ruvalcaba said yes. Ruvalcaba then made some indecipherable answers and continued to cry. Detective Felton helped wipe his eyes.[11]

Toward the end of the hour-long interview, Ruvalcaba said he was 52 rather than 53 and, after a pause, said he was born in 1972 (a decade too late). He then said, "my wife, she knows all this information."

b. Additional evidence

Discussing the circumstances of the interview, though he wore a badge on his shirt, Detective Felton admitted he never specifically told Ruvalcaba he was a detective prior to the interview. He also agreed that he tried to make Ruvalcaba believe they were friends so that Ruvalcaba would be more likely to answer questions and that he helped Ruvalcaba move his legs during the interview, in part, because he wanted to ingratiate himself to Ruvalcaba so the interview would continue. Detective Felton admitted Ruvalcaba gave incorrect or odd answers to questions, which Detective Felton agreed could be a sign Ruvalcaba's ability to remember events was impaired or that Ruvalcaba had a mental illness. Ultimately, in light of his training but without any investigation into Ruvalcaba's medical history, Detective Felton did not believe Ruvalcaba was under the influence of alcohol or drugs or mentally ill. Although Detective Felton twice asked for a buccal swab, he did not obtain clear consent for one, so did not take a swab.

---

[11]    At various points during the interview, Detective Felton asked what he could do for Ruvalcaba, providing help with physical adjustment to his legs.

10

Abigail Madden, a retired police officer, testified that in 2013 she arrested and provided Ruvalcaba *Miranda* warnings in connection with the sex offense charges involving Melissa. She said she read the warnings in English and that, although Ruvalcaba said he did not always understand English, he answered all her questions in English, and it was not obvious to Madden that English was his second language. She perceived him to understand his *Miranda* rights and her subsequent questions.

c.  Defense evidence

Psychiatrist Dr. Douglas Tucker testified as an expert in psychiatry, forensic psychiatry, addiction psychiatry, and addiction medicine, and his written report was also admitted into evidence without objection. He reviewed police and medical records, the recorded interview, and he interviewed Ruvalcaba. Dr. Tucker's opinion was that at the time of the interview, Ruvalcaba had an altered mental state and was not competent to waive his *Miranda* rights. Dr. Tucker explained the severity of Ruvalcaba's medical condition and symptoms and the possible unfavorable effect those would have on his ability to remember, understand, and relate to past and present events.

Forensic toxicologist Edwin Smith testified and wrote a report in this case. He testified that bromazepam such as Lexotan was a central nervous system depressant. People under the influence of this type of drug would demonstrate general sedation, slurred speech, poor coordination, and the person's brain would work at a slower rate. Taking 40 pills of three milligrams of bromazepam "would suggest a dramatic overdose of the drug" and combining it with alcohol represents a "much greater risk of physical harm." Smith expected that a person would take more than four days to recover normal cognitive function after consuming a 750 milliliter bottle of tequila, a can of beer, and 40 three-milligram pills of bromazepam.

**B.    Analysis**

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." To

safeguard a suspect's Fifth Amendment privilege against self-incrimination from the "inherently compelling pressures" of the custodial setting (*Miranda, supra*, 384 U.S. at p. 467), the high court adopted a set of prophylactic measures requiring law enforcement officers to advise a suspect of his or her right to remain silent and to have counsel present prior to any custodial interrogation (*id*. at pp. 444-445). "A suspect who has heard and understood these rights may waive them," but the prosecutor " 'bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances.' " (*People v. Leon* (2020) 8 Cal.5th 831, 843.)

In reviewing the trial court's denial of a suppression motion on *Miranda* and involuntariness grounds in a case where, as here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review. (*People v. Duff* (2014) 58 Cal.4th 527, 551, citing *People v. McWhorter* (2009) 47 Cal.4th 318, 346.)

    *1.*    *Pre*-Miranda *Statement*

Ruvalcaba claims he was entitled to, but did not receive, advisement of his rights pursuant to *Miranda* at the start of the interview. Ruvalcaba claims that, as a result, his statement "I shoot somebody" should have been excluded. The People disagree, arguing that Detective Felton's initial comments did not constitute custodial interrogation because Ruvalcaba would not have perceived he was in custody for *Miranda* purposes and the questions were not reasonably likely to elicit an incriminating response.

Ruvalcaba admits he did not raise this issue in the trial court. A defendant must make a specific objection on *Miranda* grounds at the trial level in order to preserve a *Miranda* claim on appeal. (*People v. Milner* (1988) 45 Cal.3d 227, 236, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.) Generally, a party cannot argue the lower court erred in failing to conduct an analysis it was never asked to perform. (*People v. Tully* (2012) 54 Cal.4th 952, 980.)

12

However, defense counsel's failure to seek the exclusion of evidence based on a *Miranda* violation may constitute ineffective assistance in violation of state and federal constitutional guaranties. (See *People v. Torres* (2018) 25 Cal.App.5th 162, 180-181.) We will therefore review the merits of the claim through this lens. To demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms and resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*People v. Williams* (1997) 16 Cal.4th 153, 214-215.) As we explain, Ruvalcaba has not carried his burden.

The advisement of *Miranda* rights is only required when a person is subject to a custodial interrogation. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) "Custodial interrogation has two components. First, it requires that the person being questioned be in custody." (*People v. Mosley* (1999) 73 Cal.App.4th 1081, 1088.) "The second component of custodial interrogation is obviously interrogation. For *Miranda* purposes, interrogation is defined as any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response." (*Id.* at p. 1089.)

"An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.] Whether a person is in custody is an objective test; the pertinent inquiry is whether there was ' " 'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " ' [Citation.]" (*People v. Leonard, supra*, 40 Cal.4th at p. 1400.) "As the United States Supreme Court has instructed, 'the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation' " — that is, "whether a reasonable person in defendant's position would have felt he or she was in custody." (*People v. Stansbury* (1995) 9 Cal.4th 824, 830.)

13

Here, the record establishes Ruvalcaba was "restrained" to his bed and that his hands were wrapped to prevent him from interfering with his medical treatment. Although Ruvalcaba's physical condition and medical treatment initially constrained his physical mobility, the armed guard placed inside Ruvalcaba's private room — where no visitors were allowed — ensured continued restriction of his movement. (See *People v. Torres, supra*, 25 Cal.App.5th at pp. 172-173 [factors for custodial interrogation include where the interview took place, whether the person was aware he or she could terminate the interview, and whether there were restrictions on the person's freedom].) We conclude that a reasonable person in Ruvalcaba's position would have considered himself to be in custody when questioned by Detective Felton.

Moreover, we conclude these questions constituted "interrogation" for purposes of *Miranda*. "Interrogation" refers to "either express questioning or its functional equivalent." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301.) What matters most is "the perceptions of the suspect," not "the intent of the police." (*Id.* at p. 301.) In this case, the questions regarding why Ruvalcaba wanted to die were probative of his consciousness of guilt and Ruvalcaba would have perceived it as an invitation to explain and make incriminating statements. (See *People v. Pettigrew* (2021) 62 Cal.App.5th 477, 498 [a defendant's attempted suicide after the commission of a crime constitutes relevant circumstantial evidence of guilt if the evidence supports an inference that the suicide attempt was an effort to evade prosecution].)

Nevertheless, we conclude the error in allowing the jury to hear and watch the unwarned statement was harmless beyond a reasonable doubt and, therefore, counsel was not ineffective for failing to raise the issue prior to trial. (See *People v. Young* (2007) 156 Cal.App.4th 1165, 1171.)

"The beyond-a-reasonable-doubt standard of *Chapman* 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.]" (*People v. Neal*

(2003) 31 Cal.4th 63, 86; see *People v. Elizalde* (2015) 61 Cal.4th 523, 542.) Another way to phrase the *Chapman* test is this: " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*People v. Merritt* (2017) 2 Cal.5th 819, 827.) Here, the answer is *yes*. Ruvalcaba's statement "I shoot somebody" could have referred to himself or Melissa — the evidence supports either interpretation. Even referring to Melissa, however, the jury would have found Ruvalcaba guilty based on overwhelming evidence of his guilt such as his post-*Miranda* statements that detailed his commission of multiple offenses, including her murder. As we explain below, we find the post-*Miranda* statement was not admitted in error.

  2.  *Post*-Miranda *Statements*

    a.  <u>Knowing and intelligent waiver</u>

Ruvalcaba also challenges the statement he made following Detective Felton's *Miranda* advisement, claiming he did not have the mental capacity to knowingly and intelligently waive his rights under *Miranda* and that his inability to understand the rights he was waiving was exacerbated by his "so-so" English. We disagree.

" 'In assessing whether the waiver was knowing and intelligent, relevant circumstances include "(i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system." ' [Citation.]" (*People v. Suarez* (2020) 10 Cal.5th 116, 160.) " '[I]n general, a suspect in custody who, having heard and understood a full explanation of these rights, then makes an uncompelled and uncoerced decision to talk, has thereby knowingly, voluntarily, and intelligently waived them.' [Citation.]" (*People v. Molano* (2019) 7 Cal.5th 620, 651.)

Insofar as Ruvalcaba is claiming that he was incapacitated to waive his rights because of the effects on his body from his voluntary ingestion of alcohol and other

drugs, he cannot prevail. The mere fact of voluntary consumption of alcohol or drugs does not establish an impairment of capacity where, as here, the evidence showed that Ruvalcaba was able to comprehend and answer all the questions that were posed to him. (See *People v. Jackson* (1989) 49 Cal.3d 1170, 1189.)

The recorded interview supports our conclusion that Ruvalcaba " 'heard and understood a full explanation' " of his rights. (*People v. Parker* (2017) 2 Cal.5th 1184, 1216.) Ruvalcaba answered affirmatively when Detective Felton asked if he understood each right, and even corrected Detective Felton's initial belief that he did not understand. Moreover, Ruvalcaba had prior experience with the criminal justice system, having been arrested in 2013 (only two years prior to the murder) and the evidence indicates he was provided with, and understood, his *Miranda* rights at that time. This supports the conclusion that Ruvalcaba had "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (*Moran v. Burbine* (1986) 475 U.S. 412, 421; see also *People v. Krebs* (2019) 8 Cal.5th 265, 302 [crediting such prior experience with the criminal justice system].) And, in specifically agreeing to speak to Detective Felton, he "act[ed] in a manner inconsistent" with the exercise of his *Miranda* rights. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 385.)

Throughout the interview, Ruvalcaba answered Detective Felton's questions without many questions of his own and was largely on-topic, providing details of the night of the murder that were corroborated by the physical evidence. For example, he said Melissa met him in her bra and underwear, which is corroborated by the fact that no other clothes for her were found at the scene. He also said she forgot her phone; it was found on her bed at home. He said she threatened to "turn him in," which was a threat linked to his sexual misconduct confirmed by evidence that he had sex with Melissa. He said he shot Melissa in the face while she was sitting — which is how she was found in his shop. Whatever physical discomfort Ruvalcaba was experiencing during the interview, his participation in the recorded interview demonstrated that he could

16

accurately perceive and recall the night of the murder and provided clear corroborated answers as to how Melissa died. This clarity of thought and memory belies his claim that his mental confusion rendered him incapable of knowingly and intelligently waiving his rights.

In an attempt to persuade us otherwise, Ruvalcaba points to his inability to recall his age or his birthday and the fact that Felton never received clear consent to take a DNA swab. However, these moments took place at the end of an hour-long interview, well past the time he waived his rights. Assuming Ruvalcaba is correct that these instances show Ruvalcaba became confused, there are no similar indicators of confusion at the start of the interview, when he waived his *Miranda* rights, and thus these later statements have minimal bearing on whether his earlier waiver was valid. Although Ruvalcaba occasionally provided indecipherable and confusing answers, as discussed, his mental capacity was not diminished to the extent he claims such that he could not waive his rights. (See *People v. Cunningham* (2015) 61 Cal.4th 609, 645 [rejecting the defendant's claim that his mental capacity prevented him from making a valid *Mirada* waiver, because "[e]ven if some of defendant's behavior was irrational or bizarre, there is no evidence his 'abilities to reason or comprehend or resist were in fact so disabled that he was incapable of free or rational choice' "].)

Nor did Ruvalcaba's self-described "so-so" English interfere with his understanding of those rights. While it is true that Detective Felton advised Ruvalcaba of his *Miranda* rights in English, the recorded interview contains no indication of a language barrier. Other evidence supports the conclusion that Ruvalcaba understood English. Specifically, Minnick testified that he and Ruvalcaba discussed farming in English. Retired officer Madden testified that two years prior, she provided *Miranda* warnings and conducted an interview with Ruvalcaba solely in English and she perceived him to understand his rights and answer questions appropriately.

17

b. <u>Voluntary waiver</u>

Contrary to Ruvalcaba's claim, the circumstances he contends amount to coercion did not render his waiver involuntary. "A confession is involuntary under the federal and state guaranties of due process when it has been extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. [Citation.] Coercive police activity is a necessary predicate to a finding that a confession was involuntary under both the federal and state Constitutions." (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 534.) Coercion is not limited to physical abuse; it may involve "more subtle forms of psychological persuasion." (*Colorado v. Connelly* (1986) 479 U.S. 157, 164.) These techniques include deprivation of sleep and food (*Greenwald v. Wisconsin* (1968) 390 U.S. 519, 520-521), "deception or communication of false information" (*People v. Hogan* (1982) 31 Cal.3d 815, 840, disapproved on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836), and "the length of the interrogation and its location and continuity, and the defendant's maturity, education, and physical and mental health" (*People v. Peoples* (2016) 62 Cal.4th 718, 740). We evaluate voluntariness of *Miranda* waivers by looking to the totality of the circumstances to determine "whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion." (*People v. Williams* (2010) 49 Cal.4th 405, 436; see also *People v. Caro* (2019) 7 Cal.5th 463, 492.)

Here, there is no suggestion of physical intimidation, deprivation of basic needs, promises, or threats. (*People v. Spencer* (2018) 5 Cal.5th 642, 672-674.) The claim of incapacity is mainly premised on Ruvalcaba's mental condition as a result of his overdose and exposure to the elements for two days. However, there is nothing in the record to indicate that Ruvalcaba's will was overborne by Detective Felton. Ruvalcaba's physical circumstances — the fact that he was in restraints of some kind, bandaged, and at times appeared uncomfortable — did not prevent him from participating in the interview or

limit him in the conversation. The video shows that Ruvalcaba was mostly calm, sometimes remorseful, and gave material responses that were corroborated by the physical evidence. There is no indication, either from Detective Felton's actions or Ruvalcaba's reactions that suggest coercion.

Ruvalcaba relies on *People v. Honeycutt* (1977) 20 Cal.3d 150, to argue that, because the waiver came on the heels of Detective Felton "softening-up" Ruvalcaba prior to advising him of his rights, the waiver was not voluntary. But *Honeycutt* has been limited to its facts. In *People v. Scott* (2011) 52 Cal.4th 452, 478, the court identified "the two salient features of *Honeycutt*" as involving (1) an interrogating officer who had a prior relationship with the defendant and who sought to "ingratiate" himself "by discussing 'unrelated past events and former acquaintances' " and (2) the officer disparaging the victim. (*Id.* at pp. 477-478.) When these two features are not present, reliance on *Honeycutt* is "misplaced." (*Id.* at p. 478; see also *People v. Michaels* (2002) 28 Cal.4th 486, 511 [rejecting the defendant's reliance on *Honeycutt* when the facts presented "are not at all like *Honeycutt*, which . . . involved 'an unrecorded 30-minute, pre-*Miranda* conversation, discussing mutual acquaintances, past events and finally the victim' "]; *People v. Kelly* (1990) 51 Cal.3d 931, 954 [finding *Honeycutt* "clearly distinguishable" when "[n]o misconduct of [the type described in *Honeycutt*] occurred here"].) Reliance on *Honeycutt* is likewise misplaced in this case, where Detective Felton did not disparage Melissa, nor seek to ingratiate himself based on past events or former acquaintances.

Ruvalcaba himself provided the likely reason why he confessed; he was remorseful that he shot Melissa. This did not involve any coercive interrogation tactic. The record supports a finding that his waiver was voluntary.

3. *Impermissible Softening-up*

Finally, Ruvalcaba claims that Detective Felton delayed delivering the *Miranda* rights until after an admission had already been obtained, in violation of *Missouri v.*

19

*Seibert* (2004) 542 U.S. 600 (*Seibert*), rendering his post-*Miranda* statements inadmissible. Ruvalcaba admits he did not raise this issue in the trial court. As before, we will review the merits of the claim through the lens of ineffective assistance of counsel.

Our high court's precedent does not support his contention. (See *Oregon v. Elstad* (1985) 470 U.S. 298; *Seibert, supra*, 542 U.S. 600.) In *Elstad*, the court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." (*Elstad*, at p. 318.) Instead, as long as both the initial unwarned statement and the subsequent warned statement are voluntary, the warned statement may be deemed the product of a defendant's "rational and intelligent choice" to confess and so is admissible. (*Id*. at p. 314; see *id*. at p. 318; *Seibert*, at pp. 608-609 (plur. opn.) ["giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver"]; see also *People v. Williams, supra*, 49 Cal.4th at p. 448 ["Even when a first statement is taken in the absence of proper advisements and is incriminating, so long as the first statement was voluntary a subsequent voluntary confession ordinarily is not tainted simply because it was procured after a *Miranda* violation"].)

Having already determined that Ruvalcaba's post-*Miranda* statements were voluntary, we must address his pre-*Miranda* statement. On appeal, Ruvalcaba does not argue his pre-*Miranda* statement was involuntarily made. His attempt, made in the reply brief, to retrofit his argument to include a challenge to the voluntariness of his pre-*Miranda* statement is insufficient; he does not identify having made the argument in his opening brief. Nor does he engage in analysis in the reply brief other than to state, "The opening brief cited the authority on coercion [rendering his *Miranda* waiver involuntary]

that is relied on here, and that clearly establishes coercion here." In general, we do not consider arguments raised for the first time in a reply brief. (*People v. Kocontes* (2022) 86 Cal.App.5th 787, 820.) Nevertheless, we conclude his pre-*Miranda* statement was voluntary.

The pre-*Miranda* portion of Detective Felton's interview was short. A review of the recorded interview reveals that within three minutes of the start of the conversation, Ruvalcaba volunteered he wanted to die and, after being asked by Detective Felton for a reason, within three minutes and 22 seconds, Ruvalcaba admitted "I shoot somebody." During this time, Ruvalcaba was lying in his hospital bed. Detective Felton casually sat next to him, straddling a chair backward to face Ruvalcaba. Prior to Ruvalcaba's inculpatory statement, Detective Felton's questions only pertained to whether Ruvalcaba remembered the circumstances of their first meeting. Detective Felton did not mention Melissa or the investigation at all. For his part, Ruvalcaba readily cooperated. He volunteered that he wanted to die and without undue prodding by Detective Felton as to why, he made the statement. We do not find these circumstances coercive.

Ruvalcaba, however, argues that the analysis in *Elstad* does not apply because Detective Felton deliberately used a question first, warn later technique in violation of *Seibert, supra*, 542 U.S. 600 and, therefore, Detective Felton's mid-stream *Miranda* warnings rendered his statement inadmissible.

In *Seibert*, the high court confronted a situation where the interrogating officer "made a 'conscious decision' to withhold *Miranda* warnings." (*Seibert, supra*, 542 U.S. at pp. 605-606 (plur. opn.).) The police officer testified that he did so in accordance with "an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that [the suspect] already provided once.' " (*Id*. at p. 606 (plur. opn.).) Another police officer testified that his department "promoted" "the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession." (*Id*. at p. 609 (plur. opn.).)

Under such circumstances, a majority of the high court found the warned confession inadmissible. (*Seibert, supra*, 542 U.S. at p. 604 (plur. opn.); *id.* at p. 618 (conc. opn. of Kennedy, J.).) The court fractured, however, on the reasoning. A plurality of four justices explained that "when interrogators question first and warn later" (*id*. at p. 611 (plur. opn.)), the later, warned confession is admissible only if "in the circumstances the *Miranda* warnings given could reasonably be found effective." (*Id.* at p. 612, fn. 4 (plur. opn.).) Justice Kennedy concurred in the judgment but proposed a different rule. Because the tie-breaking vote was by Justice Kennedy, we look to his opinion to determine the ground on which a majority of the high court agreed. (See *People v. Camino* (2010) 188 Cal.App.4th 1359, 1370 & fn. 5; *People v. Rios* (2009) 179 Cal.App.4th 491, 504-505.)

In Justice Kennedy's view, the plurality's test "cuts too broadly." (*Seibert, supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy, J.).) Justice Kennedy instead "would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." (*Ibid*.) Under that approach, where the "deliberate two-step strategy" was not employed, "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad*." (*Ibid*.) In short, *Seibert* categorically barred admission of warned statements, whether voluntary or not, that are obtained by a deliberate attempt to thwart the *Miranda* safeguards. (See *People v. Camino, supra*, 188 Cal.App.4th at pp. 1369-1370; *People v. Rios, supra*, 179 Cal.App.4th at pp. 504-505.)

We have no such deliberate attempt here. As mentioned, the interview lasted three minutes and 22 seconds before Detective Felton read Ruvalcaba his *Miranda* rights. During that time, Detective Felton spoke in a friendly way to Ruvalcaba and did not mention Melissa or the investigation. Once Ruvalcaba made an incriminating statement, Detective Felton did not attempt to obtain a comprehensive initial interview prior to obtaining another post-*Miranda* statement. (Cf. *Seibert, supra*, 542 U.S. at p. 616 (plur.

opn.) [where upon completion of a first unwarned interview, there was little, if anything, of incriminating potential left unsaid, it was clear the police strategy was to undermine the *Miranda* warnings].) Rather, he immediately advised Ruvalcaba of his rights, pausing after each one to ensure Ruvalcaba understood. After being apprised of his rights, Ruvalcaba described what happened leading up to the shooting death of Melissa. At no point did he mention an attorney or express reluctance to not account for his culpability in her death. Such conduct suggests that he "has made a deliberate choice to relinquish the protection those rights afford." (*Berghuis v. Thompkins, supra*, 560 U.S. at p. 385.) Accordingly, defense counsel's failure to move to suppress his statement in light of *Seibert* was not ineffective assistance of counsel. (See *People v. Young, supra*, 156 Cal.App.4th at p. 1171.)

### DISPOSITION

The judgment is affirmed.

/s/  
EARL, P. J.

We concur:

/s/  
RENNER, J.

/s/  
BOULWARE EURIE, J.

23